# EXHIBIT 6

**AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK**

| | |
|---|---|
| ACORDA THERAPEUTICS, INC., | AAA Arbitration No. 01-20-0010-8421 |
| *Claimant*, | |
| | Arbitrators: |
| v. | Hon. Jose L. Linares |
| | Hon. Arthur Gajarsa |
| ALKERMES PLC., | Hon. Robert S. Smith |
| *Respondent*. | **-- CONFIDENTIAL --** |

**ACORDA'S MOTION FOR SUMMARY JUDGMENT ON:
(1) ALKERMES'S UNLAWFUL MONOPOLIZATION AND
(2) THE AVAILABILITY OF CONTRACT AND QUASI-
<u>CONTRACT DAMAGES FOR ALKERMES'S BREACHES</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ......................................................................................6

LEGAL STANDARD..............................................................................................8

ARGUMENT ...........................................................................................................9

I.      ALKERMES IS LIABLE FOR UNLAWFUL MONOPOLIZATION ..............................9

        A.      Alkermes Engaged in Anticompetitive Conduct by *Unlawfully* Maintaining Its Monopoly Power in the Upstream Technology and Supply Markets Through Coercion after Its Lawful Patent Monopoly Expired in 2018 ..................9

                1.      Direct Evidence of Alkermes's Monopoly Power ...................................... 9

                2.      Indirect Evidence of Alkermes's Monopoly Power................................. 10

                3.      Alkermes's Coercion Forced Acorda to Continue to Pay Monopoly Prices After Expiration of the '938 Patent ................................................ 15

        B.      Alkermes's Anticompetitive Conduct Harmed Competition in Hallmark Antitrust Fashion By Increasing Prices, Restricting Output, and Limiting Choice for Sick MS Patients .................................................................................18

        C.      Alkermes's Anticompetitive Conduct Caused Acorda Antitrust Injury by Creating Supracompetitive Cost of Goods—Resulting in Lost Profits Exceeding $28 Million.......................................................................................20

II.     ACORDA IS ENTITLED TO SUMMARY JUDGMENT PRESERVING THE AVAILABILITY OF CONTRACT AND QUASI-CONTRACT DAMAGES................21

        A.      A Breach of the License Agreement Entitles Acorda to Contract and Quasi-Contract Damages as a Matter of Law.................................................................21

        B.      None of Alkermes's Theories Bar Acorda's Right to Recover Damages ............24

                1.      *Brulotte* and Its Progeny Do Not Bar Acorda's Claim for Contractual or Quasi-Contractual Damages .............................................................. 24

                2.      New York's Voluntary Payment Doctrine Is Not Applicable Because Acorda's Payments Were Not Voluntary ................................................. 26

                3.      The Purported "No-Refund" Provision Does Not Preclude Acorda's Claimed Damages Because It Is Not A Limitation on Damages Clause ................................................................................................................ 27

CONCLUSION......................................................................................................28

## TABLE AUTHORITIES

**Page**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Abdul v. Subbiah*,
735 N.Y.S.2d 29 (N.Y. App. Div. 2001) ...........................................................................22, 23

*Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*,
903 F.3d 1310 (Fed. Cir. 2018)...................................................................................... *passim*

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)................................................................................................................13

*APL Co. PTE v. Blue Water Shipping U.S. Inc.*,
592 F.3d 108 (2d Cir. 2010)................................................................................................5, 21

*Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*,
812 F.2d 1381 (Fed.Cir.1987).................................................................................................15

*Aventis Env't Sci. USA LP v. Scotts Co.*,
383 F. Supp. 2d 488 (S.D.N.Y. 2005).....................................................................................21

*Axis, S.P.A. v. Micafil, Inc.*,
870 F.2d 1105 (6th Cir. 1989) .................................................................................................15

*B. Braun Medical, Inc. v. Abbott Laboratories*,
124 F.3d 1419 (Fed. Cir. 1997)................................................................................................15

*Beltway 7 & Props., Ltd v. Blackrock Realty Advisers, Inc.*,
90 N.Y.S.3d 3 (App. Div. 2018) ..............................................................................................26

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979).....................................................................................................15

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
483 F. Supp. 3d 38 (D. Mass. 2020) ........................................................................................20

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*,
11 N.E.3d 676 (2014)...............................................................................................................21

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007).....................................................................................................17

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

*Brulotte v. Thys Co.*,
  379 U.S. 29 (1964) .................................................................................... *passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................8

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*,
  773 F.3d 110 (2d Cir. 2014) .................................................................27

*Concord Assocs., L.P. v. Ent. Properties Tr.*,
  817 F.3d 46 (2d Cir. 2016) ...................................................................10

*Cortes v. MTA New York City Transit*,
  802 F.3d 226 (2d Cir. 2015) ...................................................................8

*CVS Pharmacy, Inc. v. Press Am., Inc.*
  377 F. Supp. 3d 359 (S.D.N.Y. 2019) ....................................................8

*Dillon v. U-A Columbia Cablevision of Westchester*,
  100 N.Y.2d 525 (2003) .........................................................................25

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ...............................................................................15

*Elorac, Incorporated v. Sanofi-Aventis Canada, Incorporated*
  343 F. Supp. 3d 789 (N.D. Ill. 2018) ....................................................22

*F.T.C. v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ...............................................................................17

*Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*,
  2016 WL 4120635 (S.D.N.Y. July 22, 2016) ..........................................8

*Holland Loader Company, LLC v. FLSmidth A/S*,
  313 F. Supp. 3d 447 (S.D.N.Y. 2018) ...................................................21

*Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987) ..................................................................11

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ...................................................20

*Kimble v. Marvel Entertainment, LLC*,
  576 U.S. 446 (2015) ..........................................................................24, 26

# TABLE OF CONTENTS
(continued)

**Page**

*In re: Lamictal Direct Purchaser Antitrust Litig.*,
2021 WL 2349828 (D.N.J. June 7, 2021) ...................................................19

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Circ. 2020) ....................................................................19

*Laumann v. Nat'l Hockey League*,
105 F. Supp. 3d 384 (S.D.N.Y. 2015)........................................................17

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010).........................................................................8

*In re Lehman Bros. Holding, Inc.*,
544 B.R. 62 (S.D.N.Y. 2015).....................................................................27

*Lenovo (United States) Inc. v. Interdigital Tech. Corp.*,
2021 WL 1123101 (D. Del. Mar. 24, 2021) (Stark, J.)................................17

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
639 F.3d 63 (2d Cir. 2011)...........................................................................9

*In re Lyondell Chem Co.*,
544 B.R. 75 (S.D.N.Y. Jan. 4, 2016) .........................................................27

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)........................................................................18

*Malmseen v. Universal Music Group*,
940 F. Supp. 2d 123 (S.D.N.Y. 2013).........................................................8

*Mazzei v. Money Store*,
308 F.R.D. 92 (S.D.N.Y. 2015) .................................................................22

*Merced Irrigation Dist. v. Barclays Bank PLC*,
165 F. Supp. 3d 122 (S.D.N.Y. 2016).........................................................9

*Mercoid Corp. v. Mid-Continent Inv. Co.*,
320 U.S. 661 (1944)...................................................................................15

*Monovis, Inc. v. Aquino*,
905 F. Supp. 1205 (W.D.N.Y. 1994) ..........................................................16

*Pacific Bell Telephone, Co. v. linkLine Comms., Inc.*,
555 U.S. 438 (2009)...................................................................................17

## TABLE OF CONTENTS
(continued)

**Page**

*PepsiCo, Inc. v. Coca–Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) (*per curiam*) .......................................................9, 10

*PNC Bank, N.A. v. Wolters Kluwer Fin. Servs., Inc.*
  73 F. Supp. 3d 358 (S.D.N.Y. 2014).......................................................21

*Postlewaite v. McGraw-Hill, Inc.*,
  411 F.3d 63 (2nd Cir. 2005).......................................................8

*Rocky Knoll Estates MHC, LLC v. C W Capital Asset Mgmt., LLC*,
  2015 WL 1632637 (W.D.N.Y. Apr. 13, 2015) .......................................................25

*Scheiber v. Dolby Labs.*,
  293 F.3d 1014 (7th Cir. 2002) .......................................................26

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000).......................................................22

*Senza-Gel Corp. v. Seiffhart*,
  803 F.2d 661 (Fed. Cir. 1986).......................................................15

*State Street Global Advisors Trust Co. v. Visbal*,
  431 F. Supp. 3d 322 (S.D.N.Y. 2020).......................................................27

*Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n*,
  2010 WL 4983179 (S.D.N.Y. Dec. 6, 2010) .......................................................22

*Tessera, Inc. v. Toshiba Corp.*,
  2019 WL 5395158 (N.D. Cal. 2019) .......................................................24

*The Andy Warhol Foundation for the Visual Arts, Inc. v. Barth & Dreyfuss of CA*,
  2006 WL 752766 (S.D.N.Y. Jan. 6, 2006) .......................................................21

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001).......................................................14

*U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*,
  2014 WL 2199428 (S.D.N.Y. May 23, 2014) .......................................................25

*United States v. Dentsply Int'l., Inc.*,
  399 F.3d 181 (3d Cir. 2005).......................................................14

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966).......................................................13

# TABLE OF CONTENTS
(continued)

**Page**

*Verizon Comms., Inc. v. Trinko*,
  540 U.S. 398 (2004)...................................................................................17

*West Penn Allegheny Health System, Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010)........................................................................18

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
  511 F. Supp. 2d 372 (S.D.N.Y. 2007).................................................9, 20

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (2012)..................................................................................14

*Zila v. Tinnell*,
  Case No. 2:00-CV-1345 (D. Nev.) .........................................................25

**Statutes**

Sherman Act Section 2.................................................................13, 14, 15, 17

**Other Authorities**

3 Dan B. Dobbs, *The Law of Remedies* § 12.7(1) (2d ed. 1993) ..................23

Ed., *Mult Scler* 2020, *available at*
  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7720355/ ...................20

Fed. R. Civ. P. 8........................................................................................11

Fed. R. Civ. P. 56..............................................................................8, 12, 24

Fed. R. Civ. P. 56(a), (c) ..............................................................................8

Fed. R. Civ. P. 56(c) ......................................................................................8

N.Y. C.P.L.R. § 3005......................................................................................5

Walton, C., et al., *Rising Prevalence of Multiple Sclerosis Worldwide: Insights from the Atlas of MS* ...............................................................20

-- CONFIDENTIAL --

## <u>INTRODUCTION</u>

This case is about Alkermes choosing to extend its patent monopoly power unlawfully through coercion and breaching its patent licensing obligations to Acorda—a small biotech innovator. Alkermes's intentional and egregious conduct caused just the sort of ills that unlawful monopolization usually does: higher prices and restricted output and choice for consumers—who in this case are sick MS patients—than in a competitive market. Fortunately, Alkermes left a "smoking gun" paper trail that shows its conduct was both anticompetitive and intentional—and that defies the very arguments it now asserts. The undisputed material facts thus show that Acorda has established each element of its monopolization claim and is entitled to summary judgment of liability against Alkermes, an unlawful monopolist.

**Monopolistic Exploitation:** As of 2003, the industry had given up on research aimed toward safe and efficacious medical use of dalfampridine—a compound that had been used as a bird toxin for more than a century. Notably, it was Alkermes that stifled any further research and development into dalfampridine for two reasons: (1) Alkermes was the sole holder of the sustained release patents for dalfampridine in the United States—including the '938 blocking patent—and anyone using the sustained release formulation had to license those patents; and (2) Elan's/Alkermes's clinical trial failed to show the sustained release formulation was efficacious and safe.

Acorda, then a start-up company, yet willing to take more risk than the average biotech company, licensed Alkermes's patents for freedom to operate and contracted with Alkermes to provide supply. Then, Acorda made the key clinical breakthroughs that turned a potent poison into a life-changing medicine for MS patients: branded Ampyra. In so doing, Acorda bore all of the risks of the license. After sharing none of the risks of Acorda's innovative endeavor, Alkermes exploited its expiring patent monopoly in an attempt to share in the rewards through illegitimate

1

means. It now argues that, all along, it was a joint venturer or partner with Acorda rather than merely a patent licensor and supplier. But Alkermes was no such thing. In fact, Article 12.7 of the 2003 License Agreement states expressly that the "Relationship of the Parties" is *not* one of "partners or joint venturers." (Undisputed Material Fact ("UMF") 16.) Alkermes has argued ad nauseum, however, that it licensed various bundles of IP rights, the most important of which was a then-lawful patent monopoly, to Acorda altogether for a 10% royalty.

But, in any event, when the last Alkermes patent expired in 2018—and Alkermes's lawful patent monopoly expired with it—Alkermes continued to demand and collect the *same* 10% licensing royalty. It is thus indisputable that at least some portion of the 10% royalty collected after expiration of the last Alkermes patent was based on expired patents—*i.e.*, an unlawfully-extended patent monopoly.

**"Smoking Gun" Paper Trail:** Alkermes continued to collect the same 10% royalty after expiration of its last patent in 2018 even though it knew that was unlawful. In 2009, Alkermes's then in-house patent agent—and current Vice President and Head of Intellectual Property and 30(b)(6) witness—Richie Paul, wrote a memo to a colleague explaining that, absent a change in the formal inventorship of one of the Acorda Patents (the '826 Patent), such patent would "*no longer trigger a royalty* to Elan [Alkermes] under the licence [Irish spelling] agreement." He continued that a "patent issued on [Acorda's '826 patent application] would have a normal expiry date in 2024 – thus providing significant extension of protection to Elan royalties (against the possible step down envisaged in section 5.6.2 of the licence) beyond the 2013 date of the 1806 family [of which Alkermes's last-to-expire '938 Patent was a part]." (UMF 17) (emphasis added). (The '938 Patent term was subsequently extended to 2018.)

2

-- CONFIDENTIAL --

In other words, Alkermes *knew* in 2009 that it would have no basis to collect the 10% royalty from Acorda after expiration of the '938 Patent if it were not a formal inventor on a surviving Acorda Patent, which it would then argue (speciously) was thus an Elan Patent. It also knew that alleged "know-how" could not support a continued 10% royalty; otherwise, Mr. Paul would not have been so emphatic about pursuing formal inventorship of the Acorda Patent. The Panel has already ruled that Alkermes waited too long to seek a change in formal inventorship, after joining in numerous representations to courts and the public over the years that the all-Acorda inventorship is accurate. Order No. 13.[1] Further, Alkermes knew *as of September 13, 2018*, as shown in a slide deck it prepared and presented to Acorda, that the last Elan/Alkermes patent had already expired on July 30, 2018. (UMF 15; Ex. 12 at slide 4.) *Nevertheless*, when the time came for Alkermes to stop collecting the 10% royalty—or to at least propose collecting a stepped-down royalty to excise the value of the expired '938 Patent—Alkermes instead exploited the leverage of its supply arrangement with Acorda to force Acorda to pay an unlawful expired-patent licensing royalty and grossly overmarket supply pricing. At the same time, however, competing generics accessed the public domain technology for *free* and paid only market rates for supply.

**Harm to Sick Patients:** As a result, Alkermes made Acorda's cost of goods sold ("COGS") higher than they would have been in a competitive market, and it could not compete on rebate levels to stay on formularies the way it could have in a competitive market. It also could not continue its exclusive supplier agreement with the Veterans Administration Hospital System— which wanted to continue contracting with Acorda to purchase its American-made product, that was in plentiful supply, for veterans. Further, Acorda was forced to lower its monthly threshold for co-pay mitigation, rendering it unable to assist those patients who needed mitigation beyond

---

[1] And in fact, an Alkermes employee was not an inventor. Even if one had been, that would not permit Alkermes to continue collecting a 10% royalty after expiration of Alkermes's last patent.

3

-- CONFIDENTIAL --

that threshold, and discontinue free products for indigent patients. Because of Alkermes's conduct, patients suffered restricted output and choice of medicines as well as higher out-of-pocket prices than they would have in a competitive market—the very hallmarks of unlawful monopolization. Meanwhile, Alkermes pocketed over $40 million in unlawful patent licensing royalty payments and over $25 million in overmarket supply fees—which could have been used instead to help sick patients. Summary judgment against Alkermes on Acorda's claim for monopolization is warranted.

**Breach of the 2003 License Agreement:** In addition to its claim for monopolization, Acorda has alleged—and will prove at trial—that Alkermes breached the parties' 2003 License Agreement in several material ways. In an attempted end-run around the trial of that issue, Alkermes wants the Panel to eliminate the possibility of a recovery for Alkermes's breach before the Panel hears the evidence of Alkermes's breach. But at trial—and in opposition to Alkermes's forthcoming motion for summary judgment on Acorda's breach of contract claim—Acorda will demonstrate, *first*, that Alkermes's assessment and acceptance of royalties absent any Valid Claim of an Elan Patent breached Article 5.6.1 of the License Agreement. The last royalty-bearing patent with a Valid Claim, as defined by the License Agreement, expired in July 2018 with the '938 Patent, as conceded in Alkermes's own internal documents. UMF 15, 17; Ex. 12 at slide 4. Consequently, all patent-monopoly royalties collected after that point violated Article 5.6.1, as it is undisputed that no royalty has been paid pursuant to Article 5.6.2 (which was inapplicable because Alkermes continued to supply the product). *Second*, Alkermes's collection of royalties not authorized by law constitutes a breach of Article 5.9.7 of the License Agreement—which provides Alkermes was not entitled to a royalty higher than "legally permissible." After the expiration of the '938 Patent, that rate was zero dollars ($0).

-- CONFIDENTIAL --

**Availability of Contract and Quasi-Contract Damages:** Alkermes claims it has several excuses as to why it breached the License Agreement or why its actions do not constitute a breach. Those issues are for trial. So Acorda does not seek to adjudicate those breaches or Alkermes's purported excuses in this motion. Instead, Acorda focuses on the availability of contract and quasi-contract damages, assuming it prevails at trial on its claim for breach of contract. It is black letter law that "a party injured by a breach is entitled to recover damages that are the natural and probable consequence of the breach." *APL Co. PTE v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010) (applying New York law). Alkermes claims that principle does not apply for three reasons, each of which lacks merit.

- *First*, Alkermes claims that the holding in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) and its progeny bar recovery of damages for breach of contract. But that is hardly the law. *Brulotte* and its progeny hold that a licensor cannot extend its right to receive royalties beyond the term of a patent under the guise of know-how or other rights. *Brulotte* and its progeny do *not* bar recovery of damages against a licensor that has breached its license.

- *Second*, Alkermes claims that New York's Voluntary Payment Doctrine (N.Y. C.P.L.R. § 3005) (the "doctrine") bars recovery of any payments made by Acorda to Alkermes after expiration of the Elan Patents. Once again, that is not the law. The doctrine applies only to *voluntary* payments made in the absence of wrongdoing, coercion, or a mistake of material fact or law. Here, Acorda has alleged (and will prove at trial) that its post-patent expiration payments were *involuntarily* made; they were coerced through Alkermes's power to cut off supply and obstruct Acorda's efforts to secure a replacement supplier in time to compete with generic market entry and stay in business.

- *Third*, Alkermes claims that the so-called "no-refund" provision of the License Agreement bars recovery of damages. In advancing this argument, Alkermes fails to acknowledge that the "no-refund" provision is expressly subject to the audit provisions in the License Agreement that authorize, *inter alia*, the refund of over-payments.

As a matter of law, none of Alkermes's arguments prevent Acorda from recovering damages for Alkermes's breach of the License Agreement.

For these reasons, and the reasons set forth below, Acorda respectfully requests the entry of summary judgment on its monopolization claim and on the availability of contract and quasi-contract damages once Acorda proves Alkermes's breach at trial.

## STATEMENT OF FACTS

The Federal Circuit confirmed Alkermes, by virtue of holding Elan's '938 Patent, wielded a "blocking patent" that stifled opportunities for others who "wanted to pursue commercial opportunities like Ampyra." Ex. 4 (*Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1340 (Fed. Cir. 2018)). When Acorda initially engaged Elan in 1994, the scientific community, including Elan, had failed to develop dalfampridine into an FDA-approved treatment, and had all but given up on the prospect of developing an FDA-approved treatment for neurological diseases. (UMF 4.) Indeed, the uniformly held belief among researchers in the industry, even as of 2003, was that dalfampridine could never be made both efficacious and safe in treating neurological diseases. (UMF 5.) Undeterred, Acorda pressed forward with the goal of developing a ground-breaking treatment for neurological diseases, particularly with the compound dalfampridine as an active ingredient. (UMF 1, 6) To improve the efficacy and safety of the drug, Acorda needed a license to the '938 "blocking patent" owned by a company that Alkermes would later acquire, Elan Corporation, plc ("Elan"). (UMF 2-3, 6.) Acorda thus entered into a series of agreements (including the 2003 License and Supply Agreements) with Elan to obtain the freedom

-- CONFIDENTIAL --

to operate in the space and the capacity to manufacture sustained release dalfampridine. (UMF 6-7.) Subsequently, Acorda's clinical research successfully resulted in FDA approval for the branded dalfampridine drug known as AMPYRA® ("Ampyra")—the first drug approved by the FDA to improve walking speed in patients suffering from MS. (UMF 8.)

In 2011, Alkermes acquired Elan and its sustained release patents, including the '938 "blocking patent," and subsequently Alkermes abused the patent-conferred monopoly. That is, even though Acorda's royalty-bearing patent licensing obligation expired in 2018, Alkermes leveraged its supply and patent monopolies to lock Acorda into paying supracompetitive patent royalties beyond expiration of the last Alkermes patent. (UMF 18, 21-23.) Internal Alkermes memoranda as well as testimony from Alkermes's CEO confirm Alkermes's intentional conduct in unlawfully extending its patent monopoly. (UMF 17-18.) In December 2019, Acorda asked Alkermes to lower the 10% royalty, to which Alkermes responded initially that it would study the matter, but ultimately told Acorda it did "not see a reason to change the current operational or financial arrangement." (UMF 18). While it was supposedly "studying" the issue, Acorda collected over $65 million in unearned and unlawful payments, Acorda struggled to survive, and the steadily-increasing volume of MS patients faced a declining supply of dalfampridine at higher than competitive pricing.

Through its conduct, Alkermes maintained its monopoly in two relevant upstream domestic markets: (1) the technology market encompassing the '938 "blocking" Patent required to manufacture, market, and sell dalfampridine treatments ("Technology Market"), and (2) the market for the manufacture and wholesale supply of finished dalfampridine doses ("Supply Market"). (UMF 19-23.) Alkermes's patent misuse had lasting anticompetitive effects in these markets and in the relevant downstream domestic market for dalfampridine products ("Product

7

-- CONFIDENTIAL --

Market"), manifesting in supracompetitive prices, restricted output, and diminished choice for patients, physicians, and payors, (UMF 24-33.) Indeed, given Acorda's tremendous success in widely distributing Ampyra to severely health-compromised patients, Alkermes seized an opportunity to extend its patent-conferred monopoly power unlawfully so as to extract a supracompetitive cut of the profits at the expense of the very population of patients that the ground-breaking drug was intended to help. (UMF 21-33)

## LEGAL STANDARD

Summary judgment is appropriate where, as here, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (internal citation omitted); *see also* Fed. R. Civ. P. 56(a). If the moving party meets its burden to show no genuine issue of material fact exists, the burden shifts to the non-moving party to bring forward "specific facts showing a genuine issue for trial." *Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*, 2016 WL 4120635, at *4 (S.D.N.Y. July 22, 2016) (citation omitted); *see also* Fed. R. Civ. P. 56(c).

With respect to the availability of contract or quasi-contract damages, matters of contract interpretation reliant upon unambiguous language in an agreement are resolvable as a matter of law. *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2nd Cir. 2005); Fed. R. Civ. P. 56(a), (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "[T]he mere assertion of an ambiguity [in a contract] does not suffice to make an issue of fact." *Malmseen v. Universal Music Group*, 940 F. Supp. 2d 123, 131 (S.D.N.Y. 2013) (cleaned up). Under New York law, contract language is ambiguous when it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010). Whether a contract is ambiguous is a question of law for the court and "[a]mbiguity is determined by looking within the four corners of the document[.]" *CVS*

-- CONFIDENTIAL --

*Pharmacy, Inc. v. Press Am., Inc*. 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019). "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (applying New York law).

## ARGUMENT

Undisputed evidence shows Acorda (1) has satisfied the elements of its monopolization claim, and (2) has the right to seek the return of its royalty overpayments from Alkermes as contract and quasi-contract damages as a matter of law.

## I.    ALKERMES IS LIABLE FOR UNLAWFUL MONOPOLIZATION

### A.    Alkermes Engaged in Anticompetitive Conduct by *Unlawfully* Maintaining Its Monopoly Power in the Upstream Technology and Supply Markets Through Coercion after Its Lawful Patent Monopoly Expired in 2018

"Monopoly power . . . is the power to control prices or exclude competition. It may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 385 (S.D.N.Y. 2007). Both direct and indirect evidence show Alkermes acquired and then unlawfully maintained its monopolies in the Technology and Supply Markets—where it continues to hold *100%* and at least *75%* market share, respectively.

#### 1.    Direct Evidence of Alkermes's Monopoly Power

Alkermes wielded monopoly power in the Technology and Supply Markets through its ability to control prices and exclude competitors. It is "well-settled law" in the Second Circuit that "pleading a defendant's direct control over prices is an alternative to pleading relevant market share." *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 141 (S.D.N.Y. 2016);

9

*see also PepsiCo*, 315 F.3d at 107 (no market definition necessary where direct evidence shows defendants' monopoly power). Record evidence and expert testimony establishes that:

- Alkermes's '938 Patent effectively empowered it to control prices and exclude others in the Technology and Supply Markets. (UMF 21-23.) This evidence shows Alkermes leveraged its "blocking patent" monopoly power pre-expiration of the '938 Patent in order to control prices for dalfampridine technology and supply, and exclude competition for such technology and supply, post-expiration of the '938 Patent. (UMF 11-13, 18, 21-23; *Acorda*, 903 F.3d at 1340 ("defendants offered unrebutted testimony from an expert in economics and pharmaceuticals that the Elan patent acted as a blocking patent").

- These prices far exceed the competitive levels of post-expiration prices. (UMF 22-23.) Moreover, post-expiration of the '938 Patent, pharmaceutical companies other than Acorda were able to access the claimed technology for free because it had become public domain. (UMF 22; Ex. 10 (Teece Rep.) ¶ 60). As Dr. Teece opined, such evidence shows that Alkermes was able to set prices, lasting long beyond patent expiry, "without concern" for pricing of other technologies, which underscores its monopoly power in the Technology and Supply markets "prior to the expiration of the '938 Patent." Ex. 10 (Teece Rep.) ¶¶ 78-81.

### 2.     Indirect Evidence of Alkermes's Monopoly Power

Alternatively, a plaintiff can demonstrate the defendant's possession of monopoly power indirectly by defining a relevant geographic and product market and showing a defendant's excess market share within it. *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (*per curiam*). "A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" *Id.* at 105

-- CONFIDENTIAL --

(internal citation omitted). By contrast, the geographic market is generally defined in terms of the "area of effective competition, by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Concord Assocs., L.P. v. Ent. Properties Tr.*, 817 F.3d 46, 52–53 (2d Cir. 2016) (cleaned up). A court may infer monopoly power after considering the defendant's market share, "the strength of competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987).

   ***The geographic markets*** are undisputedly national in scope. In its Amended Answering Statement, Alkermes did not deny—and therefore conceded—that the relevant geographic markets in this case are domestic. *See* Fed. R. Civ. P. 8 ("An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied."). Alkermes's economist, Dr. Addanki, did not dispute the alleged geographic markets in either of his reports. And Dr. Teece explained that both the federal regulatory structure of the pharmaceutical industry and the parties' License Agreement support a domestic geographic market. Ex. 10 (Teece Rep.) ¶ 44 & n.63 (citations omitted).

   Next, the evidence shows that Acorda properly defined three relevant antitrust product markets: the Technology, Supply, and Product Markets.

   ***The Technology Market*** is properly defined here because the evidence shows no "close substitutes" for the technology detailed in Alkermes's '938 Patent, an essential technological input for the manufacture, marketing, and sale of dalfampridine. Ex. 10 (Teece Rep.) ¶ 57. The evidence shows that Alkermes was the sole licensor of this technological input pre-expiration of the '938 Patent.  After expiration of the '938 Patent, the technology detailed in it continued to be its own

11

-- CONFIDENTIAL --

relevant technology market, and market participants increased as the '938 Patent's claimed invention became public domain. *Id.* ¶¶ 58-64. Again, neither Dr. Addanki nor Alkermes has attempted to define an alternative technology market. *See* Addanki Reb. Rep. ¶ 27. And for good reason: the Federal Circuit confirmed the '938 Patent is a "blocking patent," *i.e.*, there is no substitute for obtaining freedom to operate in the dalfampridine space. *Acorda,* 903 F.3d at 1337-39, 42 (citing *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005)). The absence of a dispute between the parties on this technology market definition confirms Acorda has made a *prima facia* showing that there exists no "close substitutes—that is, [] technologies or goods that are close enough substitutes to constrain significantly the exercise of market power with respect to" the '938 Patent. *See* U.S. Department of Justice and Federal Trade Commission Antitrust Guidelines for the Licensing of Intellectual Property, 2017, § 3.2.2, p. 9 (available at https://www.justice.gov/atr/IPguidelines/download). Instead, Alkermes's monopoly power enabling it to charge Acorda supracompetitive royalties, even for post-expiration use of the '938 Patent, went unchecked because Acorda had no reasonable alternative at the time of contract formation and continues to have no reasonable alternative. (UMF 21)

*The Supply Market* is also properly defined because the manufacture and wholesale supply of dalfampridine had no reasonable substitutes until expiry of the '938 Patent. Ex. 10 (Teece Rep.) ¶ 66. Dr. Teece analyzed dalfampridine pricing and supply data in reliably confirming Acorda's proffered Supply Market (*Id.* ¶¶ 66-68), whereas Alkermes's expert rendered no similar economic analysis, instead merely disagreeing (insufficiently) with Dr. Teece's conclusion that Alkermes possessed monopoly power, *see* (Addanki Reb. Rep. ¶¶ 28-29). The evidence shows that Alkermes controlled the supply of dalfampridine, leveraging its '938 Patent to bind Acorda to obtaining at least 75% of its supply from Alkermes—and limiting Acorda to obtaining no more than 25% of

12

-- CONFIDENTIAL --

its annual supply from a second source, Patheon. (UMF 11.) But even if Acorda opted to purchase from Patheon, Alkermes still charged Acorda the same supracompetitive supply price, less an amount determined by Alkermes to represent its manufacturing costs. (UMF 13.).

*The Product Market* is also a properly defined product market that corroborates the Technology and Supply Market definitions. Alkermes agrees with the Product Market definition. *See* Alkermes Opp. to Acorda's Rule 56 Ltr. No. 5 at 1. Significantly, the undisputed propriety of the Product Market confirms that the scope of the Technology Market properly encompasses solely the essential '938 Patent for selling, manufacturing, and marketing dalfampridine and which has no reasonable substitute for producing the downstream dalfampridine treatments in the Product Market. Similarly, the undisputed Product Market establishes that the proper scope of the Supply Market covers the manufacture and wholesale supply of dalfampridine, the required active ingredient for the downstream treatments in the Product Market. As discussed *infra* at Section II, the downstream Product Market is relevant because Alkermes's exclusionary conduct in the upstream Supply and Technology Markets caused anticompetitive effects in that market. Evidence regarding the markets' characteristics circumstantially show Alkermes possessed monopoly power in the Technology and Supply Markets to cause such effects.

*Dominant Shares:* Alkermes had controlling shares of the Technology (100%) and Supply (75% to 100%)[2] Markets because the '938 Patent granted Alkermes control over the licensing and supply of dalfampridine. *See supra* at 11-12. Such dominant shares are sufficient to establish monopoly power. *See United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (87% of the

---

[2] Acorda is required to obtain a minimum of 75% of its supply from Alkermes, as it is permitted to obtain no more than 25% of its supply from the second source, Patheon. However, Alkermes likely retained well over a 75% share of the Supply Market because even if and when Acorda exercised its right to obtain up to 25% of its supply needs from Patheon pursuant to the Supply Agreement, Alkermes still imposed a monopoly tax on Acorda's alternate supply decision. *See* UMF 11, 13.

-- CONFIDENTIAL --

market is a monopoly); *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (over two-thirds is a monopoly).

**Lack of Competition:** Neither Alkermes nor Dr. Addanki genuinely disputes Alkermes's controlling shares or monopoly power in such markets. Instead, they proffer a red herring: that generic competition in the downstream Product Market precludes a finding of monopoly power in the upstream Technology and Supply Markets. *See* Addanki Reb. Rep. ¶¶ 28-29. That position is plainly wrong in focusing on post-patent expiration market dynamics because Alkermes leveraged its pre-expiration monopoly power, unchecked with no competitive constraints (*see, e.g.*, Ex. 10 (Teece Rep.) ¶¶ 57-58, 66, 79), to extract the same monopoly prices purportedly for a lesser bundle of intellectual property rights post-patent expiration. It is immaterial whether Alkermes claims it lost its monopoly upon expiration of the '938 Patent. Acorda was already "locked in" as a result of Alkermes's exercise of monopoly power, and the resulting anticompetitive effects were already unfolding with a lasting increase in prices, restriction of output, and limitation of choice. *See infra* at Section II.

**Nature of Anticompetitive Conduct:** Record evidence shows that Alkermes leveraged its patent monopoly to "lock in" Acorda to a purported obligation of paying supracompetitive royalties and supply prices, even beyond expiration of Alkermes's lawful patent monopoly in 2018. (UMF 17-18, 21-23.) Such coercive acts show a willful exercise of monopoly power. *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 265, 277 (2012); *United States v. Dentsply Int'l., Inc.*, 399 F.3d 181, 190, 194 (3d Cir. 2005). And resulting anticompetitive effects, discussed *infra* at Section II, are "strong indicator[s]" that Alkermes wielded monopoly power. *See Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001).

-- CONFIDENTIAL --

*High Barriers to Entry and Inelastic Demand:* There is no genuine dispute between the parties that Alkermes's monopoly power was protected by high barriers to entry, including research and development costs, requisite regulatory approval by the FDA, and intellectual property held by those in the relevant field. Ex. 16 (Lee Dep.) at 132:21-133:13 (discussing patent barriers to entry); Ex. 40 (Glynn Dep.) at 50:17-51:8 (discussing clinical and regulatory barriers to entry); Manspeizer Dep. at 144:7-145:24 (admitting it takes "years and millions of dollars" to bring a drug like Ampyra to market); Ex. 2 (Cohen Dep.) at 41:7-42:14, 57:13-58:5 (discussing a start-up's need for infrastructure, capital, and employee talent).

### 3. Alkermes's Coercion Forced Acorda to Continue to Pay Monopoly Prices After Expiration of the '938 Patent

"[T]o be condemned as exclusionary, a monopolist's act must have 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58 (emphasis in original). Courts have found that misuse of a patent can be a basis for antitrust liability if the seller exploits its lawfully obtained dominant position to unlawfully acquire or maintain market power. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992) ("[P]ower gained through some . . . legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'").[3] Second Circuit law confirms it is a violation of Section 2 of the Sherman Act for Alkermes to leverage its monopoly power in the Technology and Supply

---

[3] *See also B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419, n.5 (Fed. Cir. 1997) ("Our precedent has explained that the same actions by a patentee that result in patent misuse may also serve as an element of an affirmative claim for damages . . . under an antitrust or breach of contract theory."); *Axis, S.P.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989) (while "a lawfully acquired patent may create a monopoly that does not violate the antitrust laws," "patent abuse may constitute an antitrust violation"); *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*, 812 F.2d 1381, 1385–86 (Fed.Cir.1987) (holding that a finding of bad faith is necessary to establish antitrust liability based on patent misuse); *Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 668 & n.10 (Fed. Cir. 1986) (acknowledging that patent misuse "may also serve as an element in a complaint charging [an] antitrust violation."); *Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 664 (1944) (collecting cases: "[T]his Court has consistently held that the owner of a patent may not employ it to secure a limited monopoly of an unpatented material used in applying the invention.").

-- CONFIDENTIAL --

markets pre-expiration to give itself a competitive advantage and harm competition in these markets and the Product Market post-expiration. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir. 1979) ("[T]he use of monopoly power attained in one market to gain a competitive advantage in another is a violation of [§] 2, even if there has not been an attempt to monopolize the second market. It is the use of economic power that creates the liability.").

The evidence plainly shows that Alkermes leveraged its monopoly power, prior to expiration of the '938 Patent, to bind Acorda to pay supracompetitive prices and to sole-source supply from Alkermes after expiration of the '938 Patent. There is no dispute: Alkermes asserts it is entitled to impose such restraints based on the pretext that the *same* 10% royalty is owed for Alkermes's so-called "Know-How" and purported "interests" in Acorda's patents.[4] *See, e.g.,* Alkermes Ltr. No. 3 Opp. at 1-2. But without a step-down for payments on the lesser bundle of IP rights, it is clear that Alkermes is leveraging its pre-expiration patent monopoly to lock Acorda into supracompetitive prices, even though Acorda's patent-bearing royalty obligations have expired. (UMF 17-18, 21-23; Ex. 10 (Teece Rep.) ¶¶ 57-58, 62-63, 66, 79; Ex. 3 (Waldron Dep.) at 132:5-18.) This is true regardless of how the precise issues as to Know-How are determined at trial.

Nor can Alkermes's threat to assert its alleged "Know-How" to restrain Acorda from terminating the Supply Agreement, and choosing alternative suppliers at market pricing, shield it from antitrust liability: "The suggestion that one has a right to exclude others from the use of his trade secret because he has a right to property in the idea has been frequently advanced and rejected." *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1224 n.58 (W.D.N.Y. 1994). In the time

---

[4] It is particularly perverse for Alkermes to claim Acorda's patents are royalty-bearing since, as a practical matter, they were all but adjudicated invalid in their entirety after a final judgment found the representative claims were obvious and thus invalid. *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.,* 903 F.3d 1310, 1342 (Fed. Cir. 2018).

-- CONFIDENTIAL --

period after expiration of the '938 Patent, market pricing for supply was less than a 1% fee—far

less than the 8% fee that Alkermes has continued to charge Acorda. (UMF 23.) The anticompetitive

nature of Alkermes's foreclosure of alternative supply is further underscored by the undisputed

fact that Alkermes imposes a monopoly tax on Acorda even when it chooses to source from

Patheon, Alkermes's designated secondary supply source for Acorda. UMF 13.[5]

Contrary to Alkermes's misapplication of antitrust law, the documentary evidence and

expert testimony confirm its conduct is exclusionary because it resulted in anticompetitive effects.

*See infra* at 18-20; Ex. 10 (Teece Rep.) ¶¶ 89-110. As Acorda has explained previously,

Alkermes's reliance on *Verizon Comms., Inc. v. Trinko,* 540 U.S. 398 (2004) and *Pacific Bell*

*Telephone, Co. v. linkLine Comms., Inc.,* 555 U.S. 438 (2009) is misplaced because it is irrelevant

that Alkermes has no antitrust duty to deal with *rivals*; these cases do not provide refuge for a

monopolist like Alkermes who abuses its monopoly power to bind a *customer* like Acorda to

supracompetitive prices and sole-sourced supply after expiration of its lawful patent monopoly.

To the contrary, case law supports that such conduct exposes the monopolist to antitrust liability.

*See supra* n.3; *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (breach of

standard essential patent holder's promise to license on reasonable terms "is actionable

anticompetitive conduct"); *Lenovo (United States) Inc. v. Interdigital Tech. Corp.*, 2021 WL

1123101, at *7 (D. Del. Mar. 24, 2021) (Stark, J.) (Section 2 exclusionary conduct adequately

alleged where defendant unlawfully obtained upstream technology market power to license its

patents practiced in downstream product market). Much like the defendants in *Broadcom* and

---

[5] Critically, Acorda has never been able simply to stop paying the unlawful royalties to Alkermes—doing so would risk Alkermes suing for a material breach of the cross-default provisions of the License and Supply Agreements and cutting off supply that Acorda needs to distribute Ampyra. UMF 14; Ex. 10 (Teece Rep.) ¶¶ 57-64, n. 82.

-- CONFIDENTIAL --

*Lenovo*, Alkermes misused its '938 Patent in a way that enabled it to restrain competition and collect supracompetitive royalties.

> **B.    Alkermes's Anticompetitive Conduct Harmed Competition in Hallmark Antitrust Fashion By Increasing Prices, Restricting Output, and Limiting Choice for Sick MS Patients**

Acorda shows that Alkermes's conduct harmed competition in two ways: directly—by showing higher prices, reduced output, or lower quality in the market as a whole—and indirectly—by showing market power and that the challenged conduct "has the potential for genuine adverse effects on competition." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *Laumann v. Nat'l Hockey League,* 105 F. Supp. 3d 384, 397 (S.D.N.Y. 2015) ("[A]nticompetitive conduct is injurious if it limits consumer options."); *see also MacDermid Printing Solutions LLC v. Cortron Corp.,* 833 F.3d 172, 183 (2d Cir. 2016) ("We have suggested that actions that reduce consumer choice are inherently anticompetitive."); *West Penn Allegheny Health System, Inc. v. UPMC,* 627 F.3d 85, 100 (3d Cir. 2010) ("Anticompetitive effects include increased prices, reduced output, and reduced quality."). Record evidence directly shows that by binding Acorda to the anticompetitive license and supply restraints, Alkermes caused anticompetitive effects in the form of increased prices, reduced output, and diminished choice.

*Increased Prices:* Several Acorda witnesses detailed how Alkermes's royalty burden increased Acorda's COGS,[6] which hamstrung Acorda in rebate negotiations with PBMs and payors. (UMF 30.) Thus, Alkermes deprived Acorda of the financial flexibility to compete with generic entrants and secure rebate agreements and direct purchase contracts with customers, which in turn would have ensured lower prices in the market overall, as well as to patients through their

---

[6] The U.S. Department of Justice's Merger Guidelines §4(a) (2020) support that raising another firm's costs is another harmful effect of unilateral conduct. Alkermes' conduct, in raising Acorda's costs, is particularly anticompetitive in causing the undisputed increase in prices, restriction of output, and limitation of choice.

-- CONFIDENTIAL --

insurance plans. (UMF 24-33; Ex. 19 (Malackowski Rep.) at 61-70 (identifying lost accounts caused by Alkermes's conduct). Moreover, without the royalty burden, Acorda's lower net prices likely would have secured "brand over generic" ("BOG") deals in which Ampyra, because of its low price, would be available on formulary to patients at a low formulary price. (UMF 24-25, 30). At a minimum, Acorda would have obtained "parity deals" in which Ampyra would been adjudicated to be on formularies at a lower co-pay or co-insurance for a brand drug and be available to patients at a minimal incremental price over generics. Ex. 19 (Malackowski Rep.) at 61-66.

Alkermes's conduct therefore not only resulted in higher costs to Acorda, but also higher prices to payors and patients, who were deprived of increased price competition between Ampyra and generics.[7] Dr. Teece's economic analysis of the evidence further confirms Alkermes's conduct caused higher prices in the form of reduced price competition with generics and the financial crippling of Acorda, preventing it from taking steps to lower consumer prices by mitigating patients' copays and improving their access to Ampyra. Ex. 10 (Teece Rep.) ¶¶ 100-10; Ex. 24 (Clem Dep.) at 147:25-148:24 (describing royalty burden's effect on price competition with generics). Indeed, the undisputed fact that Ampyra's authorized generic by Mylan failed supports that Alkermes's patent misuse stifled competition, resulting in lost contract opportunities with payors and thus higher prices. UMF 29-30, Teece Reb. Rep. ¶¶ 9-14.

**Restrained Output and Limited Choice:** Record evidence also confirms that Alkermes's restraints on Acorda restricted output and limited the choices of dalfampridine. Had Alkermes not imposed the anticompetitive restrictions, Acorda would have secured favorable formulary

---

[7] To compete successfully with generics, Acorda did not have to offer the same or lower prices per bottle; but it had to come down further on rebate levels than it could with its unlawful royalty burden imposed by Alkermes. (UMF 29.) And contrary to Alkermes's argument that pharmaceutical brands do not compete with generics, there is ample evidence in the industry that they do. *See, e.g., In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 189 (3d Circ. 2020); *In re: Lamictal Direct Purchaser Antitrust Litig.*, 2021 WL 2349828, at *2 (D.N.J. June 7, 2021) (on remand).

19

-- CONFIDENTIAL --

placements to improve Ampyra's availability to patients at a co-pay or co-insurance level much lower than the otherwise off-formulary or list price. *See* Ex. 19 (Malackowski Rep.) at 41, 61-66, 86. This improved market access translates to increased availability of Ampyra and thus greater volume (and lower prices) for dalfampridine in the but-for world. Indeed, sworn testimony confirms that by contrast, in the actual world, with Alkermes's anticompetitive conduct, output (*i.e.*, brand and generic dalfampridine volume) decreased after expiry of the '938 Patent, contrary to the typical market dynamics post-generic entry. (UMF 31.) Moreover, Ampyra's disadvantaged formulary positions diminished consumer access to Ampyra and reduced product variety because off-formulary Ampyra meant it was either not accessible under a patient's plan or only accessible at prohibitively high cost. (UMF 32-33.)

The tragedy of these restrictive, anticompetitive effects is that they occurred while the demand for dalfampridine escalated, as evidenced by the fact that the prevalence of MS cases in the U.S. doubled from 2013 to 2019. *See* Walton, C., et al., *Rising Prevalence of Multiple Sclerosis Worldwide: Insights from the Atlas of MS*, 3d Ed., *Mult Scler* 2020, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7720355/.) Thus, there is no triable issue on anticompetitive effects; undisputed evidence shows Alkermes's conduct increased dalfampridine prices and restricted output and access to Ampyra just when patients needed more of the medicine, whether brand or generic.

### C.     Alkermes's Anticompetitive Conduct Caused Acorda Antitrust Injury by Creating Supracompetitive Cost of Goods—Resulting in Lost Profits Exceeding $28 Million

Finally, Acorda indisputably has suffered injury "of the type the antitrust laws were intended to prevent . . . flow[ing] from that which makes defendants' acts unlawful." *Atl. Richfield Co.*, 495 U.S. at 334. Expert testimony confirms that as a result of Alkermes's conduct, Acorda has paid—and Alkermes continues to demand—a monopolistic, supracompetitive overcharge in

20

the form of the 10% royalty rate and 8% supply rate, and has lost profits from disadvantaged formulary placements and substantial lost accounts. Ex. 10 (Teece Rep.) ¶¶ 112-14, 118-29; Ex. 19 (Malackowski Rep.) at 90-91. Monopoly overcharges and lost profits are quintessential forms of antitrust injury in monopolization cases. *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 61 (D. Mass. 2020) ("supracompetitive licensing fees" is a "competitive injury"); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 221 (S.D.N.Y. 2019) ("supracompetitive prices" are "plainly" antitrust injury); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 382 (S.D.N.Y. 2007) (antitrust injury found where "loss of business . . . stem[med] from conduct that prevents potential customers from obtaining a desired product"); *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 499 (S.D.N.Y. 2005) (similar).

## II. ACORDA IS ENTITLED TO SUMMARY JUDGMENT PRESERVING THE AVAILABILITY OF CONTRACT AND QUASI-CONTRACT DAMAGES

### A. A Breach of the License Agreement Entitles Acorda to Contract and Quasi-Contract Damages as a Matter of Law

The fundamental principle of contract damages is that "a party injured by a breach is entitled to recover damages that are the natural and probable consequence of the breach." *APL Co. PTE v. Blue Water Shipping U.S. Inc*., 592 F.3d 108, 111 (2d Cir. 2010) (applying New York law). "The proper measure of damages for breach of contract is the amount necessary to put the plaintiff in as good a position as it would have been if the defendant had not breached the contract." *The Andy Warhol Foundation for the Visual Arts, Inc. v. Barth & Dreyfuss of CA*, 2006 WL 752766, at *2 (S.D.N.Y. Jan. 6, 2006). When the alleged breach of contract concerns only the payment of money, remedy for the breach is comprised of principal owed plus damages in the form of interest at the prevailing rate. *Id*. at *4. Under New York law, such damages constitute general contract damages. *PNC Bank, N.A. v. Wolters Kluwer Fin. Servs., Inc*. 73 F. Supp. 3d 358, 370 (S.D.N.Y.

WEST\296183070.17

-- CONFIDENTIAL --

2014). "General damages are the natural and probable consequence of the breach of a contract." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (2014) (cleaned up) (holding lost profits are recoverable general damages when they result from a breach of the contract itself). In the context of a breached license agreement, lost profit damages are available where, as here, a plaintiff can (1) "demonstrate[] with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) … the damages were fairly within the contemplation of the parties." *Holland Loader Company, LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 480-81 (S.D.N.Y. 2018) (explaining a defendant who breached a license agreement would have been liable for damages had plaintiff established them to a non-speculative degree). Where a contract does not expressly address damages, "the court must take a 'common sense' approach, and determine what the parties intended by considering the 'nature, purpose and particular circumstances of the contract known by the parties … as well as what liability the defendant fairly may be supposed to have assumed consciously." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (quoting *Kenford Co. v. County of Erie*, 537 N.E.2d 176, 179 (N.Y. 1989)).

As an example, a federal court applying New York law in *Elorac, Incorporated v. Sanofi-Aventis Canada, Incorporated* found general damages regarding royalty payments were available for a breach of contract claim. 343 F. Supp. 3d 789, 803-04 (N.D. Ill. 2018) (applying New York law). Even though the contract had a limitation on liability clause, the court explained that general damages were still available because the "royalty provisions … are the fruit of the Agreement," and would be "*essentially meaningless if a party breaching them is not liable for … lost royalties [] as general damages in a breach of contact action*." *Id*. The court aptly reasoned "[t]here would have been no point entering into such a detailed agreement if non-performance could carry no

22

-- CONFIDENTIAL --

possibility of sanction." *Id*. For the same rationale, Acorda is entitled to general contract damages in the form of at least overpaid royalties for Alkermes's breach of the License Agreement.

Further, "restitution damages may be awarded where a party "renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy." *Mazzei v. Money Store,* 308 F.R.D. 92, 106 (S.D.N.Y. 2015). Generally, this equitable remedy is not available when there is an enforceable contract. *Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n*, 2010 WL 4983179, at *3 (S.D.N.Y. Dec. 6, 2010). To the extent, however, the Panel finds the License Agreement is not enforceable or is repudiated, quasi-contract (*i.e.*, restitution) damages are available. *Id.*; *accord Abdul v. Subbiah*, 735 N.Y.S.2d 29, 30 (N.Y. App. Div. 2001) (affirming award of restitution damages for breach of contract by non-performance). As explained by a leading treatise on this topic, "[t]he general principle is that upon the defendant's substantial breach or repudiation of an enforceable contract, the plaintiff is entitled to recover restitution of any benefits he has conferred in performance of the contract . . . or the reasonable value of any services rendered as contract performance." 3 Dan B. Dobbs, *The Law of Remedies* § 12.7(1) (2d ed. 1993). Consequently, in some instances, even where there is an enforceable contract, restitution is appropriate where the breach of contract was for non-performance. *See* 1 Dobbs §4.1; *see also Abdul*, 735 N.Y.S. at 30.

The right to pursue the foregoing remedies cannot seriously be contested by Alkermes. Instead, Alkermes offers several different theories why Acorda should be precluded from pursuing its claim for damages. But as demonstrated below, those theories lack any legal or factual support, and none of those theories preclude Acorda from pursuing its claim for damages.

23

-- CONFIDENTIAL --

**B.      None of Alkermes's Theories Bar Acorda's Right to Recover Damages**

Alkermes has advanced three theories as to why Acorda's claim for damages should be denied.  Each of these theories or defenses is deficient or inapplicable and accordingly, they should be disregarded.

### 1.      *Brulotte* and Its Progeny Do Not Bar Acorda's Claim for Contractual or Quasi-Contractual Damages

In *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), the Supreme Court held that a contract calling for the payment of patent royalties after the expiration of the licensed patent constitutes patent misuse and is *per se* unenforceable under the Supremacy Clause of the Constitution. *Id.* at 32-33 ("we conclude that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*. If that device were available to patentees, the free market visualized for the post-expiration period would be subject to monopoly influences that have no proper place there."). Forty years later, the Supreme Court reaffirmed its holding in *Brulotte* in *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015), and explained that:

> [T]he core feature of the patent laws on which *Brulotte* relied remains just the same: Section 154 now, as then, draws a sharp line cutting off patent rights after a set number of years.  And this Court has continued to draw from that legislative choice a broad policy favoring unrestricted use of an invention after its patent's expiration. *Scott Paper*—the decision on which *Brulotte* primarily relied—remains good law. So too do this Court's other decisions refusing to enforce either state laws or private contracts constraining individuals' free use of formerly patented (or unpatentable) discoveries.

*Id.* at 458.

Nowhere in *Brulotte* or *Kimble* does the Supreme Court state or declare that a licensee who has been victimized by a *Brulotte* violation shall be denied a contractual remedy. Indeed, given the clear and unequivocal language from the Supreme Court—*i.e.*, that post-patent royalty provisions are "unlawful *per se*"—it would be inapposite for the Court to have also declared that there is no remedy for such a violation. Yet that is what Alkermes contends in this case. And the

24

-- CONFIDENTIAL --

only authority on which Alkermes relies in its prior letter briefs[8] does not cite or rest on the rule in *Brulotte*.

In *Tessera, Inc. v. Toshiba Corp.,* 2019 WL 5395158, *5-*7 (N.D. Cal. 2019), there was no post-patent royalty provision involved. Indeed, the Court explained that "*Brulotte*, therefore, does not apply because Toshiba made royalty payments based on other patents it believed were unexpired, valid, and enforceable." *Id*. Not only does *Tessera* fail to support Alkermes's theory, but also it has no application to this case.[9]

The only other case that Alkermes has raised to date in its prior briefing is *Zila v. Tinnell*, Case No. 2:00-CV-1345 (D. Nev.). Alkermes claims that the district court "Order dated 4/22/04 (D.I. 172)," supports its position that a *Brulotte* violation bars contractual damages. Alkermes is wrong. The district court order was not based on *Brulotte*, but instead on the application of equitable principles based on the Restatement (Second) of Contracts. *Id*. at 3. And, although Alkermes claims that the district court decision was affirmed on appeal ("aff'd, 502 F.3d at 1027 n.11"), it was not—the Ninth Circuit "REVERSED and REMANDED for proceedings consistent with this opinion." *Id*. Thus, Alkermes is relying on (and citing to) a district court order that was inapplicable and overturned. As to the claim for damages, the Ninth Circuit specifically stated that it was "not addressing Zila's unjust enrichment claim, as it may never arise" given the existence of a new licensed patent that needed to be analyzed by the district court. *Id*. at 1025-27.

---

[8] *See* Alkermes's Opposition to Acorda's Rule 56 Letter No. 4 re Availability of Contract and Quasi-Contract Damages and Alkermes's Letter No. 7 Requesting Permission to File a Motion for Summary Judgment on Acorda's Claims III, IV, V, and III Seeking a Refund.

[9] *Tessera* involved a licensee challenging the *validity* of the licensed patent. The district court in *Tessera* held that although the licensee may assert a claim of invalidity, the licensee is not entitled to a refund of the royalties paid for the use of the invalid patent. *Id*.

-- CONFIDENTIAL --

Neither of the cases that Alkermes has previously cited and relied on supports its position and neither do the underlying cases from the Supreme Court. Alkermes's theory that *Brulotte* and its progeny preclude a claim for contractual damages is legally without any support or merit.

> **2.      New York's Voluntary Payment Doctrine Is Not Applicable Because Acorda's Payments Were Not Voluntary**

New York's voluntary payment doctrine (the "doctrine") bars the recovery of voluntary payments, which are payments made in the absence of wrongdoing or a mistake of material fact or law. *Dillon v. U-A Columbia Cablevision of Westchester*, 100 N.Y.2d 525, 525 (2003); *accord U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co*., 2014 WL 2199428, at *10 (S.D.N.Y. May 23, 2014). The doctrine "does not apply when a party makes payments under economic duress or compulsion[.]" *Rocky Knoll Estates MHC, LLC v. C W Capital Asset Mgmt., LLC*, 2015 WL 1632637, at *2 (W.D.N.Y. Apr. 13, 2015). As a matter of law, the doctrine thus cannot apply here.

*Mistake of law or fact*. Alkermes must concede one of two points. Either, it has been operating under a mistake of law as to the proper application of *Brulotte*, or it has been operating under a mistake of fact as to the commercial value of its alleged extant Know-How. Regardless, on this record, it cannot establish the doctrine's applicability. As a matter of law, *Brulotte* and *Kimble* preclude the assessment of royalties on an expired patent.  Moreover, and again, as a matter of law, to the extent Alkermes owns commercially valuable Know-How that Acorda has been using since the expiration of the '938 Patent, Alkermes had to submit evidence of its fair market value.  *See Scheiber v. Dolby Labs*., 293 F.3d 1014, 1023 (7th Cir. 2002). Alkermes has failed to meet that burden. Alkermes has presented no such evidence of the specific fair market value of such alleged Know-How.

*Economic Duress*. The undisputed evidence of record establishes that Alkermes's demanded payments after July 2018 were unlawful and Acorda was in the position of having "no

-- CONFIDENTIAL --

other choice but to accede" to payment. *See Beltway 7 & Props., Ltd v. Blackrock Realty Advisers, Inc.*, 90 N.Y.S.3d 3, 7 (App. Div. 2018) (explaining a justifiable fear of foreclosure on a valuable portfolio of properties could substantiate an economic duress claim). As explained above, payments collected after July 2018 violated *Brulotte* and were therefore unlawful. Moreover, as explained in Argument Section I.A.3, *supra*, Acorda was forced to accede to Alkermes's royalty demands because of Alkermes's coercive use of its outsized leverage during contract negotiations and the cross-default provisions in the License and Supply Agreements.

### 3. The Purported "No-Refund" Provision Does Not Preclude Acorda's Claimed Damages Because It Is Not A Limitation on Damages Clause

Finally, Alkermes endeavors to bar Acorda from its requested relief through its attempt to transform the "no-refund" provision in Article 5.8 of the License Agreement into a limitation on damages clause fails as well as a matter of law. Implicit in this argument is that Acorda has waived its right to seek damages, but Acorda has done no such thing.

"A waiver is an *intentional* relinquishment of a known right." *In re Lehman Bros. Holding, Inc.*, 544 B.R. 62, 70 (S.D.N.Y. 2015) (cleaned up) (emphasis added). Where, as here, there is a claim of an express, but not an implied waiver, a court does not have to examine the parties' intent and can resolve the issue as a matter of law. *Id.* To that end, only where a party's "express declarations . . . are so inconsistent with [its] purpose to stand upon [its] rights as to leave no opportunity for a reasonable inference to the contrary," can waiver be established as a matter of law. *Id.*

Article 5.8 is not an express waiver of damages; it is not a limitation on damages provision. Express language limiting liability or the categories of available damages is necessary to evidence the agreement of parties to a contract "on the allocation of risk of economic loss in the event that the contemplated transaction is not fully executed[.]" *In re Lyondell Chem Co.*, 544 B.R. 75, 85

27

-- CONFIDENTIAL --

(S.D.N.Y. Jan. 4, 2016). Otherwise, there would be an impermissible passive waiver of rights, which the parties to the contract are otherwise entitled by law, without notice or consent.

Additionally, Article 5.8 cannot be read in isolation. As a matter of black letter contract law, all provisions of a contract must be read together as a whole and given effect. *State Street Global Advisors Trust Co. v. Visbal*, 431 F. Supp. 3d 322, 357 (S.D.N.Y. 2020); *accord Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014). As a threshold matter, Article 5.8 is expressly "subject to the provisions of Article 5.9.5[,]" which authorizes a two-year look-back audit for royalty payments. Moreover, both Article 5.8 and Article 5.9.5 must be read in conjunction with Article 5.9.7, which requires that the "royalty rate for sales … shall be adjusted to the highest legally permissible or government-approved rate," when warranted.

Had Acorda and Alkermes intended to limit liability or preclude a category of relief, they would have included such language in the License Agreement. But they did *not*. Alkermes cannot now play "gotcha" with Acorda's rights based on a cherry-picked contractual provision.

## **CONCLUSION**

For the foregoing reasons, Acorda respectfully asks the Panel to grant Acorda's Motion for Summary Judgment, finding that:

(a)     Alkermes is liable for monopolization, with the only triable issue being damages; and

(b)     Contract and quasi-contract damages are available remedies for Acorda as a matter of law should it prove Alkermes's breach at trial.

28

-- CONFIDENTIAL --

DATED:  October 15, 2021

Respectfully submitted,

*/s/   John S. Gibson*
John S. Gibson
DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067
T: (310) 595-3039
John.gibson@us.dlapiper.com

Ellen A. Scordino
DLA Piper LLP (US)
33 Arch Street
Boston, MA 02110
T: (617) 406-6085
Ellen.scordino@us.dlapiper.com

Michael Sitzman
DLA Piper LLP (US)
555 Mission Street, Ste. 2400
San Francisco, California
T: (415) 836-2500
Michael.sitzman@us.dlapiper.com

*Attorneys for Claimant Acorda Therapeutics, Inc.*

29